# EXHIBIT 1

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* GTY TECHNOLOGY HOLDINGS INC., a Cayman Islands exempted company, GTY GOVTECH, INC., a Massachusetts corporation, GTY TECHNOLOGY MERGER SUB, INC., a Delaware corporation, GTY INVESTORS, LLC, a Delaware limited liability company company, HARRY L. YOU, an individual, STEPHEN J. ROHLEDER, an individual, and DOES 1 through 50, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
OPENGOV, INC.

> FOR COURT USE ONLY
> *(SOLO PARA USO DE LA CORTE)*
>
> **ENDORSED FILED**
> SAN MATEO COUNTY
>
> NOV 2 0 2018
>
> Clerk of the Superior Court
> By  MIRNA P. RIVERA-MARTINEZ
> DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* |
| San Mateo County Superior Court | 18C I V06264 |
| 400 County Center | |
| Redwood City, CA 94063 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
JOHN W. KEKER, JEFFREY R. CHANIN, NICHOLAS S. GOLDBERG, KEKER, VAN NEST & PETERS LLP
633 Battery Street, San Francisco, CA 94111, telephone 415-391-5400; fax 415-397-7188

| DATE: | Clerk, by | NEAL TANIGUCHI | , Deputy |
|---|---|---|---|
| *(Fecha)* NOV 2 0 2018 | *(Secretario)* | MIRNA P. RIVERA-MARTINEZ | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* GTY INVESTORS, LLC, A DELAWARE LIMITED LIABILITY COMPANY COMPANY

under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☒ other *(specify):* CORPORATION CODE 17061
4. ☐ by personal delivery on *(date):* 11/26/18

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc. www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |

KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
JEFFREY R. CHANIN - # 103649
jchanin@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:   415 397 7188

**FILED**
SAN MATEO COUNTY

NOV 20 2018

Clerk of the Superior Court
By _____
DEPUTY CLERK

Attorneys for Plaintiff
OPENGOV, INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| OPENGOV, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GTY TECHNOLOGY HOLDINGS INC., a Cayman Islands exempted company, GTY GOVTECH, INC., a Massachusetts corporation, GTY TECHNOLOGY MERGER SUB, INC., a Delaware corporation, GTY INVESTORS, LLC, a Delaware limited liability company, HARRY L. YOU, an individual, STEPHEN J. ROHLEDER, an individual, and DOES 1 through 50, inclusive.<br><br>Defendants. | Case No.   **18CIV06264**<br><br>**COMPLAINT FOR BREACH OF CONTRACT, INDUCING BREACH OF CONTRACT, FRAUD, AND TRADE SECRET MISAPPROPRIATION**<br><br>**JURY TRIAL DEMANDED**<br><br>18 – CIV – 06264<br>CMP<br>Complaint<br>1505925<br> |

**COMPLAINT**
Case No.

1311030

1        Plaintiff OpenGov, Inc. ("OpenGov"), by and through its attorneys, Keker, Van Nest &

2  Peters LLC, for its Complaint against Defendants GTY Technology Holdings Inc., a Cayman

3  Islands exempted company ("GTY Holdings"), GTY Govtech, Inc., a Massachusetts corporation

4  ("New GTY"), GTY Technology Merger Sub, Inc. ("GTY Merger Sub"), GTY Investors, LLC

5  ("GTY Investors"), Harry L. You ("You"), Stephen J. Rohleder ("Rohleder"), and Does 1–50

6  (collectively, "the GTY Defendants") alleges as follows:

7
## I.    NATURE OF THE ACTION

8       1.     This case arises out of the GTY Defendants' deliberate theft and misuse of

9  Plaintiff OpenGov's proprietary, confidential and trade secret information, in blatant disregard of

10  the parties' confidentiality agreement.

11       2.     OpenGov is a critically acclaimed pioneer and leader in the cloud-based public

12  sector software solutions market, providing budgeting, operational performance, and citizen

13  engagement software to more than 2,000 public sector agencies nationwide.  Since the City of

14  Palo Alto became its first customer in 2012, OpenGov has expanded its software offerings

15  internally and by acquiring complimentary companies to serve its rapidly growing customer

16  base, one that now includes the states of California, Missouri, Nebraska, Maryland, Delaware,

17  Colorado, Ohio, Idaho, West Virginia, hundreds of municipalities including the District of

18  Columbia and the City of San Jose, school districts, and other public sector organizations.  To

19  continue its growth path and better serve its customer base, OpenGov has been executing a

20  proprietary, confidential "platform rollup acquisition strategy," targeting for acquisition specific

21  companies having particular attributes and products that, when integrated, would permit

22  OpenGov to offer a scalable, robust, and best-in-class suite of diverse, cloud-based software

23  products to secure its place as the leading, vertically-integrated franchise for the cloud-based

24  public sector software solutions market, and to do good for our nation's communities.

25       3.     Defendant GTY Holdings is a "blank check," publicly-held special purpose

26  acquisition company ("SPAC") that has no business of its own.  GTY Holdings raised $550

27  million in its October 2016 initial public offering (IPO) with a general purpose to effect some

28  merger, acquisition or other business combination with one or more businesses in some industry

1    by November 2018, after which time it would need to return its shareholders' money if no such

2    business combination was completed.

3         4.    In late-April 2017, Defendant You, one of GTY Holdings' promoters, asked an

4    OpenGov Board member to introduce him to OpenGov's CEO Zachary Bookman to discuss a

5    potential transaction. Six months after its IPO, the GTY Defendants still had no viable

6    acquisition strategy nor letter of intent to acquire any companies using the GTY Holdings SPAC.

7    Defendant You, therefore, proposed a transaction whereby GTY Holdings would use its $550

8    million SPAC Trust Account to acquire OpenGov and to finance the acquisition of one or more

9    complimentary companies.

10        5.    The GTY Defendants possessed scant knowledge about OpenGov's business or

11   the specifics of the cloud-based public sector software solutions market, let alone the detailed

12   information that OpenGov possessed both about the market and about other companies' product

13   offerings, customers, and potential to be combined with OpenGov. For that, they needed

14   OpenGov's insights, market intelligence, and cloud / software-as-a-service (SaaS) platform

15   expertise.

16        6.    To advance the parties' discussions that would involve OpenGov's disclosure of

17   its proprietary and confidential information to the GTY Defendants, GTY Holdings and

18   OpenGov entered into a Confidentiality Agreement on May 9, 2017. Defendant GTY Holdings,

19   described as the "Recipient" of information in the Agreement, promised to keep OpenGov's

20   confidential information "strictly confidential," and further agreed that such information could

21   only be used by the GTY Defendants for a transaction that included OpenGov. The Agreement

22   specifically recited that Confidential Information included "the identities of any parties involved

23   in such a possible transaction, and all other information provided in connection therewith."

24        7.    After entering into the Confidentiality Agreement, OpenGov disclosed its

25   confidential and trade secret information to the GTY Defendants, and briefed Defendant You,

26   his co-promoters William Green and Joseph Tucci, and GTY Holdings' Director Defendant

27   Rohleder on the details of OpenGov's platform roll-up acquisition strategy, including the

28   identities and attributes of the specific acquisition targets that OpenGov had selected from

among the hundreds of companies offering software for the public sector.  During the first half of 2018, OpenGov disclosed to the GTY Defendants the identities of each of the target companies that OpenGov had selected as acquisition candidates.  OpenGov arranged calls and meetings between the acquisition targets and the GTY Defendants, and brokered negotiations between those companies and the GTY Defendants about the terms of a combination with OpenGov through a merger and acquisition using the GTY Holdings SPAC.  In anticipation of a combination with the acquisition candidates it had identified, OpenGov's executives expended countless hours and substantial resources to accomplish the transaction.

8.   OpenGov did all of this because the GTY Defendants courted OpenGov and led OpenGov to believe that any transaction GTY Holdings closed in the public sector software solutions market would have OpenGov at its core, consistent with GTY Holdings' written agreement that OpenGov's confidential information would be used <u>only</u> in connection with a potential transaction with OpenGov.

9.   The GTY Defendants also falsely represented that GTY Holdings would acquire OpenGov for $225–$250 million in cash and stock and combine it with OpenGov's roll-up acquisition targets to create a vertically-integrated, public sector software business combination worth more than $1 billion, by Defendant You's account.  OpenGov's CEO Bookman was to become the CEO of the combined company, and two of OpenGov's directors were to sit on its board.  Defendant You encouraged Mr. Bookman to tell OpenGov's acquisition targets that they would be partners with OpenGov in the contemplated transaction, and Defendant You told the acquisition targets this himself.  Meanwhile, the GTY Defendants courted Mr. Bookman with lavish dinners and invitations to exclusive events, like game seven of the NBA Finals.

10.   But, unbeknownst to OpenGov, the GTY Defendants had decided to cut out OpenGov and misappropriate OpenGov's confidential platform roll-up acquisition strategy and trade secret information for itself.  In July 2018, after months of acquiring OpenGov's trade secrets and collaborating with OpenGov to execute OpenGov's platform roll-up acquisition strategy, and in the midst of negotiating the terms of a final letter of intent, the GTY Defendants began to duck OpenGov's calls, put off meetings, and delay further discussions.  When

1  confronted by one of OpenGov's directors, Defendant You advised that the GTY Defendants did

2  not intend to pursue the transaction.  But OpenGov subsequently learned that the GTY

3  Defendants were operating behind OpenGov's back to pursue acquisitions of the companies that

4  OpenGov had identified and personally introduced to GTY as acquisition candidates for

5  OpenGov's platform roll-up strategy.

6      11.    On September 12, 2018, just weeks after abandoning OpenGov, the GTY

7  Defendants issued a press release announcing that GTY Holdings had entered into definitive

8  agreements to acquire for $497 million six companies to "create the leading North American

9  SaaS/Cloud software company focused on the public sector."  Each of the companies was a roll-

10  up acquisition target that OpenGov had selected from the large and fragmented field of public

11  sector software vendors, had identified to the GTY Defendants, and had actively courted for a

12  combination with OpenGov.  In fact, the GTY Defendants led the acquisition candidates

13  themselves to believe that OpenGov would be at the center of the business combination.

14      12.    Adding insult to injury, when announcing the transaction, the GTY Defendants

15  reinvented history by crediting the sponsors of GTY Holdings with OpenGov's business

16  strategy, insight and foresight.  They falsely claimed that, "[a]fter an extensive search process,

17  the [GTY] sponsors elected to bring together best-in-class companies to establish an integrated

18  software solution in the highly fragmented and underpenetrated public sector market."  The

19  segments of the markets to be addressed by the combination, the benefits of doing so, and the

20  manner of doing so, also were all disclosed to GTY by OpenGov.

21      13.    The GTY Defendants defrauded OpenGov, breached their Agreement to use

22  OpenGov's confidential information only for a transaction involving OpenGov, misappropriated

23  OpenGov's trade secrets, and seized for themselves every key aspect of OpenGov's proprietary

24  platform roll-up acquisition strategy, including, among other things, OpenGov's "clouds

25  framework" and the specific acquisition candidates that OpenGov had identified for a

26  combination with itself.  The GTY Defendants did so to create exactly what OpenGov had

27  envisioned—a new, vertically-integrated business combination that could offer a best-in-class

28  suite of cloud-based software solutions for the public sector.  Without misappropriating

OpenGov's proprietary, confidential and trade secret information and expertise, without taking advantage of OpenGov's reputation and personal relationships to gain an entrée to the candidate companies, and without OpenGov's extensive work to facilitate the acquisitions, the GTY Defendants would never have gotten to first base in putting together the announced combination.

14.     The GTY Defendants intend to complete their business combination by May 1, 2019.  If approved by GTY Holdings' shareholders, the GTY Defendants' business combination would establish the exact, vertically-integrated cloud-based software platform that OpenGov envisioned as the culmination of its platform roll-up acquisition strategy, but one that will compete directly with OpenGov.

15.     OpenGov therefore brings this action for preliminary and permanent injunctive relief, for a constructive trust over OpenGov's interest in New GTY and GTY Merger Sub—the entities that the GTY Defendants created to combine OpenGov's platform roll-up acquisition targets into a new company—for the disgorgement of the GTY Defendants' ill-gotten profits and unjust enrichment, and for compensatory and punitive damages.

## II.     PARTIES

16.     Plaintiff OpenGov is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 955 Charter Street, Redwood City, California.

17.     Defendant GTY Technology Holdings Inc. is a Cayman Islands company, with its principal place of business at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada.

18.     Defendant GTY Govtech, Inc., formerly known as GTY Technology Holdings, Inc., is a corporation organized under the laws of Massachusetts with its principal place of business at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada.

19.     Defendant GTY Technology Merger Sub, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada.

20.     Defendant GTY Investors, LLC is a Delaware limited liability company, with its principal place of business at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada.

1311030

21.     Defendant Harry L. You is an individual who, on information and belief currently resides in New Hampshire.

22.     Defendant Stephen J. Rohleder is an individual who, on information and belief, currently resides in Texas.

23.     Defendants Does 1 through 50, inclusive, whether individuals, corporations, partnerships or otherwise, are fictitious names of Defendants whose true names are, at this time, unknown to Plaintiff.  Plaintiff is informed, believes and thereon alleges that each of said fictiously named Defendants contributed to the damages herein alleged or has been unjustly enriched by reason of the Defendants conduct alleged herein, and Plaintiff will name such Defendants when their identities have been ascertained.

### III.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, § 10, because this case involves causes of action not given by statute to other trial courts or administrative agencies

25.     This Court has jurisdiction over the GTY Defendants under California Code of Civil Procedure §§ 410.10 and 410.50 because they are doing business in California, and/or because they intentionally directed their activities at OpenGov, which has its principal place of business in California, and/or because the actions giving rise to this Complaint occurred in California, and/or because the injuries alleged herein occurred in California.

26.     Venue is proper in this judicial district, pursuant to California Code of Civil Procedure §§ 395(a) and 395.5, because it is the county in which injury occurred, where the contract at issue was made or was to be performed, where the obligation or liability arises, and where the breach occurred.

27.     The amount in controversy, exclusive of interest, costs, and attorney's fees, exceeds the jurisdictional minimum of $25,000.

1311030

# IV.   GENERAL ALLEGATIONS

## A.   OpenGov is a Leading Provider of Cloud-Based SaaS Software for Public Sector Budgeting, Operational Performance, and Citizen Engagement.

28.   OpenGov was founded in 2012 by Zachary Bookman, Joseph Lonsdale, and technologists from Stanford University, who studied government budgeting in the aftermath of the Great Recession.  The team observed dedicated public servants struggling to use antiquated technology that prevented them from accessing timely spending information and communicating their priorities to citizens and elected officials.  Believing there was a better way, OpenGov developed cloud-based software solutions to facilitate more open, effective, and accountable government.

29.   Today, OpenGov is furthering its mission of powering more effective and accountable government by providing its proprietary cloud-based software to more than 2,000 public agencies in 48 states who collectively oversee $10 trillion of public funds.  OpenGov's customers use its software to streamline budgeting, analyze revenues and expenses, measure their performance, leverage open data to communicate with stakeholders, improve accountability, and operate more effectively.  As a cloud-based solution, OpenGov's software-as-a-service (SaaS) software is easy to use and configure, can be frequently updated to add new features with no incompatibility with prior releases, can be scaled as a customer's needs grow, is highly available, and, as a subscription, priced to ensure customer value.

30.   To expand its business and offer new and better solutions to serve its public sector customers' needs, OpenGov developed a proprietary, confidential platform roll-up strategy to acquire software companies from different sub-sectors of the cloud-based public sector software solutions market and integrate them with OpenGov.  In April 2016, OpenGov acquired Ontodia, the leading open-source provider of open data and performance management solutions.  OpenGov's next acquisition was in October 2017, when it acquired Peak Democracy, an online civic engagement platform.  During the first six months of 2018, OpenGov identified and initiated negotiations with several software companies about combining with OpenGov.

COMPLAINT
Case No.

1311030

**B.      GTY Holdings is a "Blank Check" Special Purpose Acquisition Company.**

31.      In August 2016, a trio of former Accenture and EMC executives, William D. Green, Joseph M. Tucci and Harry L. You, founded GTY Holdings as a Special Purpose Acquisition Company ("SPAC").

32.      A SPAC is a publicly-traded company that raises capital through an IPO, for the purpose of completing an acquisition, merger, or other business combination with one or more existing private companies.  The money raised through the IPO of the SPAC is held in an interest-bearing trust account until the SPAC identifies a merger or acquisition opportunity to pursue.  If the SPAC does not effectuate a business combination within a specified time, typically two years, then it automatically dissolves and the money it holds in trust is returned to its public shareholders.  If the SPAC does complete a shareholder approved combination using essentially all of its IPO assets within the requisite time, which may be extended, the promoters of the SPAC receive up to a 20% promoter's interest in the new combination, typically worth tens or hundreds of millions of dollars for the promoters.

33.      Green, Tucci, and You established GTY Investors to act as the promoter (sometimes referred to as the "sponsor") of GTY Holdings.  Green, Tucci, and You are the members and managers of GTY Investors.  Through Defendant GTY Investors, Green, Tucci, and You collectively hold an approximately seventeen percent promotional interest in GTY Holdings.

34.      In late October 2016, GTY Holdings completed an IPO, generating proceeds of $552 million to use to effectuate its planned business combination.  Under the terms of its prospectus and articles of association, GTY Holdings had two years from the closing of its IPO—until November 1, 2018—to complete an initial business combination having a fair market value equal to at least 80% of its assets.  In October 2018, GTY Holdings' shareholders approved an extension to this deadline, giving GTY Holdings until May 1, 2019 to complete its initial business combination.

1311030

**C.     GTY Holdings Approaches OpenGov About a Potential Transaction.**

35.     In April 2017, Defendant You approached OpenGov to discuss a potential transaction involving GTY Holdings and OpenGov.  At the time, the GTY Defendants' plan to effectuate a business combination was only conceptual.  While the GTY Defendants were searching for opportunities in the "technology industry" generally, they had virtually no understanding or knowledge of OpenGov, or of the cloud-based public sector software solutions market that OpenGov had helped pioneer.  The GTY Defendants did not know the leading companies in the market, who ran those companies, those companies' attributes, strengths and weaknesses, or if and how those companies could be integrated to create a platform of best-in-class cloud-based solutions for public sector customers.  The GTY Defendants similarly lacked information regarding OpenGov's software products, financials, customers and customer requirements, or business strategies.  The GTY Defendants were simply looking for a good business opportunity, and were trying to gather information and put something promising together before time expired on their SPAC.

36.     Claiming that they would use their publicly bank-rolled $550 million SPAC to work with OpenGov to fulfill OpenGov's vision for a dominant cloud-based platform in the public sector software market, the GTY Defendants induced OpenGov to disclose its proprietary, confidential and trade secret information, tapped into OpenGov's extensive expertise and knowledge of the cloud-based public sector software solutions market, and exploited OpenGov's reputation and business relationships in that market to assemble a new business combination to be financed by the GTY Holdings' SPAC.

**D.     The GTY Defendants Agree to Use OpenGov's Confidential Information Only in Connection with a Transaction with OpenGov.**

37.     On May 9, 2017, OpenGov and GTY Holdings entered into a Confidentiality Agreement, a true and correct copy of which is attached hereto as **Exhibit A**.  The Confidentiality Agreement identifies GTY Holdings as the intended "Recipient" of confidential information, and broadly defines "Confidential Information" to include "all information conveyed by [OpenGov] or [OpenGov's] 'Representatives'" to Recipient GTY Holdings in

"whatever form, whether written, electronic or oral." The Agreement protects as confidential "all information conveyed by" OpenGov to GTY Holdings, but also specifically includes as Confidential Information: (i) "all analyses, compilations, reports, forecasts, studies, interpretations or other documents ... *that contain reflect or are based upon, in whole or part, the information furnished to*" GTY Holdings; (ii) "the existence of a possible transaction involving [OpenGov] or discussions thereof, *the identity of any parties involved in such possible transaction, and all other information provided in connection therewith.*" (italics added).

38.     GTY Holdings agreed to "retain in strict confidence all Confidential Information" provided to them by OpenGov, and to use such Confidential Information "only in connection with ... a Potential Transaction with [OpenGov]...."

**E.      The GTY Defendants Engaged in a Scheme to Misappropriate OpenGov's Proprietary Platform Roll-up Acquisition Strategy, Under the False Pretense of Creating a Business Combination with OpenGov at its Core.**

**1.      OpenGov provides the GTY Defendants confidential, propriety, and trade secret information under the Confidentiality Agreement.**

39.     For more than a year after entering into the Confidentiality Agreement, from May 2017 through June 2018, the GTY Defendants milked OpenGov for confidential, propriety and trade secret information regarding OpenGov's products, business plans, strategies, intelligence, and insights regarding software solutions for the public sector market.  The GTY Defendants induced OpenGov to disclose its confidential information to the GTY Defendants under the false pretense that the GTY Defendants would use GTY Holdings' SPAC funds to acquire OpenGov for $225–$250 million, and would use the remainder of the SPAC funds to execute OpenGov's proprietary platform roll-up acquisition strategy by acquiring additional, best-in-class companies identified by OpenGov—companies that offered complimentary products and possessed other attributes for successful integration with OpenGov.  Defendant You repeatedly assured OpenGov's CEO Bookman that OpenGov would be at the core of any business combination that the GTY Defendants might consummate in the public sector software solutions market.

40.     In the early months of the parties' joint venture, OpenGov spent significant time and resources educating the GTY Defendants about OpenGov, its products, financials, business

1311030

strategies, competitors, and the public sector software solutions market.  During this period, OpenGov's CEO Bookman participated in dozens of meetings, telephone calls, and discussions with the GTY Defendants, and provided numerous written materials, disclosing OpenGov's confidential information, trade secrets, and proprietary business strategies.

41.  Beginning in July 2017, in the first phase of the joint venture, OpenGov identified several potential acquisition candidates that had already achieved revenue streams of a size that Defendant You had indicated would be sufficient for acquisition by a publicly held SPAC like GTY Holdings.  However, after discussions with OpenGov and GTY, these companies expressed a lack of interest in being acquired by a SPAC.

42.  By January 2018, with half the time for GTY Holdings' to complete a business combination having expired, Defendant You urged OpenGov's CEO Bookman to "hustle" and identify smaller companies who might be more open to consolidating with OpenGov and being acquired by GTY Holdings' SPAC.  Defendant You asked Bookman to make overtures to these companies on behalf of the joint venture, and urged Bookman to sell them on the concept by assuring them that OpenGov would support and partner with them, that Bookman would be the CEO of the merged enterprise, and that GTY Holdings would provide the capital for the transaction.  Defendant You represented that, if the companies were interested in pursuing the transaction, Bookman should then introduce them to the GTY Defendants to "handle the deal stuff."

43.  To initiate this next phase of the joint venture, on March 28, 2018, OpenGov sent the GTY Defendants confidential materials containing trade secret information that described in detail the proprietary platform roll-up acquisition strategy that OpenGov had developed.  The cover email from OpenGov to the GTY Defendants explicitly designated these materials confidential in all-caps text, stating: "These materials are CONFIDENTIAL of course."  The materials included: (i) a PowerPoint slide deck disclosing OpenGov's plans to develop an "OpenGov Platform [that] Will Lead Industry Consolidation;" (ii) a five-page "Corp Dev Strategy" memo revealing OpenGov's confidential analysis of the dynamics of the cloud-based public sector software solutions market, and detailing OpenGov's proprietary "platform play;"

11

1311030

1   and (iii) a confidential summary of OpenGov's financials and performance metrics from fiscal

2   year 2015 through fiscal year 2018.

3       44.   · The confidential materials provided by OpenGov spelled-out in detail OpenGov's

4   platform roll-up acquisition strategy.  The "Corp Dev Strategy" memo, for example, described

5   OpenGov's "rollup strategy" to acquire companies in "three distinct 'clouds'"—*i.e.,* cloud-based

6   software companies focused on different sub-sectors of the public-sector technology

7   marketplace—with "[a]dditional 'clouds' [to] be added."  Those "clouds" included a "Budget

8   Cloud," "ERP + Performance Cloud," "Transparency Cloud," "Regulatory Cloud," "Public

9   Safety Cloud," and a "Parks Cloud."

10      45.  OpenGov's confidential memo, in turn, identified from among hundreds of

11   companies offering public sector software a few specific "potential acquisition targets" in each

12   cloud, and how each target company "fit into the OpenGov 'clouds' framework."  For example,

13   Questica and Sherpa—two of the companies the GTY Defendants subsequently announced they

14   were acquiring—are both listed in the Budget Cloud, with descriptions of their estimated size

15   and revenues, and an analysis of how and why they fit into OpenGov's platform roll-up

16   acquisition strategy.  Similarly, Open Counter is listed in the "Regulatory Cloud," with

17   OpenGov's analysis of how it would fit into the roll-up strategy.

18      46.  In mid-April 2018, OpenGov identified to Defendant You, and then approached, a

19   fourth company that it desired to acquire and add to the OpenGov platform—eCivis, a purveyor

20   of grants management and cost allocation software for the public sector.

21      47.  On May 18, 2018, OpenGov's CEO Bookman flew to Austin, Texas to meet with

22   Defendant Rohleder, a GTY Holdings director whom Defendant You had identified as his likely

23   choice to serve as Chairman of the Board of the consolidated company.  Defendant You

24   requested that Bookman meet with Rohleder to orient him and present and explain OpenGov's

25   proprietary platform roll-up acquisition strategy.  Like the other GTY Defendants, before

26   meeting with Bookman, Defendant Rohleder did not have OpenGov's specialized knowledge of

27   the state and local government cloud-based public sector software solutions market or of

28   OpenGov's approach to creating a best-in-class suite of cloud-based tools for that market.

48.     Bookman and Defendant Rohleder met for approximately 2 hours, with Defendant You participating by telephone throughout.  During the meeting, Bookman described in greater detail to Rohleder and You the specifics of OpenGov's market analysis, its roll-up strategy, as well as the rationale for acquiring the specific companies that OpenGov had identified in the confidential materials it had provided to GTY in late March.  OpenGov retained a photograph of a whiteboard that its CEO Bookman used during the meeting to organize some of the information that he imparted during the meeting, which names four of the five companies that OpenGov had previously identified and that GTY has since announced it intends to acquire:



49.     During the May 18 meeting, Bookman also identified and discussed with Rohleder the fifth company that he had previously identified and introduced to the GTY Defendants— eCivis.  After the meeting concluded, Rohleder drove Bookman to the airport and re-affirmed that the parties' joint venture to execute OpenGov's platform roll-up acquisition strategy was a "go."

1311030

50.    Following the May 18, 2018 meeting, Bookman and Defendant You exchanged a series of text messages about the transaction. Bookman disclosed additional detail about OpenGov's plan to architect a cloud strategy in the "permitting and regulatory space," the subsector in which its acquisition target Open Counter was doing business. You responded enthusiastically, and reconfirmed in one of his text messages that the newly combined company would be managed by Bookman, with OpenGov directors sitting on its board.

51.    Just one week later, on May 25, 2018, You, Rohleder, and the GTY Defendants' bankers at Citibank traveled to California for an in-person meeting at OpenGov's Redwood City headquarters, with the GTY Defendants' attorneys participating telephonically. During this meeting, OpenGov presented information regarding its financial performance and the parties continued to discuss the plan for executing OpenGov's platform acquisition strategy.

52.    Following this meeting, OpenGov put together a virtual "data room" of OpenGov confidential information to which it provided access to the GTY Defendants, their bankers, and their lawyers. The data room included, among other things, a 36-page confidential and proprietary presentation detailing OpenGov's trade secret strategy to "build[] the dominant cloud-based software platform" in the public sector software market "through both organic growth and a roll-up of the top enterprise SaaS companies in the space." The presentation explained that the public sector software market was at a "[o]nce-in-a-[g]eneration [i]nflection [p]oint," presenting the ideal market conditions to execute OpenGov's confidential and proprietary acquisition strategy. Like OpenGov's early-March 2018 memo, this confidential presentation identified many of the same acquisition targets that the GTY Defendants subsequently entered into agreements to acquire, including Questica, Sherpa, Open Counter, and Bonfire.

53.    Records show that the GTY Defendants' bankers at Citibank downloaded OpenGov's confidential information from the data room, including OpenGov's presentation detailing its proprietary platform roll-up acquisition strategy. OpenGov has sent a written request to Citibank to return or destroy OpenGov's confidential information, but OpenGov has

1 received no response or assurances from Citibank or the GTY Defendants that OpenGov's

2 confidential information has been deleted.

3      54.   On May 27, 2018, OpenGov's CEO Bookman identified and introduced Defendant

4 You to the CEO of a sixth company that was part of OpenGov's platform roll-up acquisition

5 strategy—CityBase, Inc, a developer of technology, payment and communication channels

6 software, and an aggregator of operational data.

7         **2.   OpenGov diligently executes on, and includes GTY Holdings as the financier of, OpenGov's proprietary platform roll-up acquisition strategy.**

8

9      55.   From March through June 2018, OpenGov expended considerable effort and

10 committed substantial time and expenditures to execute OpenGov's part of the joint venture.

11      56.   After selecting the acquisition candidates for OpenGov's platform roll-up

12 acquisition strategy and making preliminary overtures himself, OpenGov's CEO Bookman

13 personally introduced the GTY Defendants to executives of five of the six acquisition targets

14 that GTY Holdings subsequently announced it was going to acquire for itself:

15         i)   <u>March 12, 2018</u>:  Bookman introduced the GTY Defendants to Craig Ross,

16 the Chief Revenue Officer of **Questica**, an acquisition target providing software in the budget

17 sector.

18         ii)   <u>April 15, 2018</u>: Bookman introduced the GTY Defendants to James Ha, the

19 CEO of **eCivis**, an acquisition target offering cloud-based software in the grants management

20 sector.

21         iii)   <u>April 27, 2018</u>:  Bookman introduced the GTY Defendants to Corry Flatt,

22 the CEO of **Bonfire**, an acquisition providing cloud-based software in the government

23 procurement sector.

24         iv)   <u>May 14, 2018</u>:  Bookman introduced the GTY Defendants to Joel

25 Mahoney, the CEO of **OpenCounter**, an acquisition target providing a front-end permitting

26 system in the government regulatory sector.

27

28

v)      May 27, 2018:  Bookman introduced the GTY Defendants to Mike Duffy, the CEO of **CityBase**, an acquisition target providing utility billing and payment processing software in the government regulatory sector.

57.     In addition, in May 2018, OpenGov CEO Bookman engaged in discussions to negotiate a transaction for OpenGov to acquire **Sherpa**, an acquisition target providing software in the budget sector.  OpenGov had planned to acquire Sherpa before the business combination with GTY Holdings, and then, when the GTY business combination was completed, GTY Holdings would acquire OpenGov, which would include Sherpa's products.  But, after the GTY Defendants cut out OpenGov, Sherpa broke-off negotiations with OpenGov.  Unbeknownst to OpenGov, the GTY Defendants had approached Sherpa directly to negotiate an acquisition of Sherpa by GTY Holdings.  The GTY Defendants subsequently announced that GTY Holdings intends to acquire Sherpa.

58.     In reliance on the GTY Defendants' repeated representations that OpenGov would be the core of GTY Holdings' planned business combination, OpenGov worked diligently to ready itself for the intended business combination.  Among other things, OpenGov hired the Connor Group to perform extensive pre-audit work, retained Ellenoff Grossman & Shole as outside counsel specializing in SPAC transactions to assist OpenGov with the contemplated business combination, and engaged PwC to perform a formal audit.  GTY subsequently hired the exact same audit group and partner at PwC that OpenGov had retained.  During this period, Bookman was in regular—sometimes daily, or even hourly—contact with Defendant You to discuss OpenGov's progress on executing its platform roll-up acquisition strategy, and to advance the negotiations between the GTY Defendants, OpenGov, and the target companies.

> **3.      The GTY Defendants promise to acquire OpenGov and to execute the platform roll-up acquisition strategy.**

59.     Throughout this period, the GTY Defendants repeatedly represented that OpenGov would be the centerpiece of the parties' contemplated business combination—which the GTY Defendants claimed would be worth over $1 billion on day one—and that Bookman would be

the CEO of the combined company, with OpenGov's directors to serve on the board of the new combined company.

60.     On April 23, 2018, the GTY Defendants sent OpenGov a draft letter of intent to acquire OpenGov for $225 million in stock. The letter of intent described that the GTY Defendants' acquisition of OpenGov was part of OpenGov's "Roll-Up Strategy," and that the "parties"—*i.e.,* the GTY Defendants and OpenGov—intended "to enter into letters of intent with target companies" to be acquired "simultaneous with the Closing of the merger of GTY with [OpenGov]."

61.     Two days later, Defendant You confirmed to one of OpenGov's directors during a phone call that the GTY Defendants had been collaborating with OpenGov to find "companies to combine with, to make a great initial company we'd be taking public through the [GTY Holdings] SPAC." These were the companies that OpenGov had identified as the targets of OpenGov's proprietary platform roll-up acquisition strategy and had disclosed to the GTY Defendants in confidence as part of their joint venture. That same day, Defendant You sent a text message to Bookman reporting that You "[h]ad a good call with" OpenGov's board member, and advising that Joe Tucci, GTY's co-founder, co-chairman, and co-CEO, would be talking with another OpenGov board member soon.

62.     On May 3, 2018, Defendant You informed Bookman that the GTY Defendants were preparing to send letters of intent to the "other targets" OpenGov had identified, and that the GTY Defendants were aiming to complete the deal by May 18, 2018; he urged "let's try to wrap this up by 5/18, if possible…. Onward!"

63.     Defendant You also induced OpenGov to initiate a comprehensive audit of its business to prepare for the contemplated acquisition, noting that this was a "gating item" to the contemplated transaction. In reliance on GTY's assurance that it would acquire OpenGov and provide capital for the additional platform roll-up acquisitions, OpenGov spent considerable time, effort, and resources preparing for and launching a comprehensive audit of OpenGov, including retaining PwC to conduct the audit, and hiring an experienced Chief Financial Officer to ready itself to be taken public.

64.     On May 6, 2018, Defendant You sent an email to Bookman crowing that, after the

GTY Holdings transaction closed, "[w]e will be worth over a billion with cash on Day 1!"

65.     By the end of May 2018, the GTY Defendants and OpenGov were in contact

nearly every day to discuss the details and execution of OpenGov's platform roll-up acquisition

strategy. On May 30, 2018, for example, Defendant You sent a series of text messages

entreating Bookman to personally contact the CEO of Bonfire to help finalize the acquisition of

Bonfire per OpenGov's strategy. Defendant You urged Bookman to tell Bonfire's CEO that "it

will be great to be partners," "you [Bookman] will help him turbocharge his business,"

"[OpenGov's] directors and GTY guys are good guys," "this is a truly unique opportunity,"

"time is of essence," and "you [Bookman] [will be] the CEO [of the combined business]!"

66.     Just two days later, on June 1, 2018, the GTY Defendants sent OpenGov a revised

letter of intent increasing the acquisition price to $250 million in cash and stock. In this letter of

intent, the GTY Defendants represented that they were "very impressed with [OpenGov's]

leadership, its market position and its attractive growth trajectory," and wanted to acquire

OpenGov "to build a world-class, market-leading company." Again, the letter of intent stated

explicitly that the GTY Defendants' acquisition of OpenGov was part of the "Roll-Up Strategy,"

and that the GTY Defendants and OpenGov intended "to enter into letters of intent with other

target companies" to be acquired "simultaneously with the Closing of the Transaction" between

GTY Holdings and OpenGov.

67.     OpenGov continued to collaborate with the GTY Defendants on a nearly daily

basis throughout early-June of 2018 to effectuate OpenGov's platform roll-up acquisition plan.

**F.      The GTY Defendants Go Behind OpenGov's Back, Hijack OpenGov's Platform Roll-Up Acquisition Plan, and Execute Agreements to Acquire the Companies Identified by OpenGov to Form a New GTY Combination to Compete with OpenGov.**

68.     In mid-June 2018—after more than a year of milking OpenGov for its proprietary

confidential and trade secret information and taking advantage of that information to learn

OpenGov's strategy and gain an entrée to the companies targeted by OpenGov—the GTY

Defendants began to duck OpenGov's calls, put off meetings, and delay further discussions. But

COMPLAINT
Case No.

1311030

the GTY Defendants continued to lead-on OpenGov, making excuses for their failure to respond to OpenGov's inquiries. Defendant You claimed to be "off the grid" on vacation from June 15, 2018 through June 25, 2018. In reality, Defendant You and the other GTY Defendants were buying time to negotiate with OpenGov's acquisition targets behind OpenGov's back, and without telling OpenGov or the acquisition targets that the GTY Defendants did not intend to complete the business combination with OpenGov. Only when confronted by one of OpenGov's directors on or about July 1, 2018, did Defendant You finally admit that the GTY Defendants were no longer planning to do business with OpenGov.

69.     On September 12, 2018, the GTY Defendants announced that GTY Holdings had entered into definitive agreements to acquire, for a total acquisition price of $365 million plus aggregate earn-out consideration of up to $132 million, six of the companies that OpenGov had identified when disclosing its proprietary roll-up acquisition strategy and to which it had introduced the GTY Defendants—Bonfire, CityBase, eCivis, Open Counter, Questica, and Sherpa.

70.     On information and belief, shortly before the GTY Defendants announced their business combination publicly, they held an "unveiling dinner" in New York City, where they revealed the identity of their six acquisition targets to executives of those six companies, among others. Before this unveiling dinner, on information and belief, the GTY Defendants told those target companies not to talk to others about the potential transaction. On information and belief, at this unveiling dinner, several executives of the six acquired companies were shocked when they learned that OpenGov was not included in the business combination, since OpenGov had introduced five of those companies to the GTY Defendants and OpenGov's involvement in the transaction played an integral role in those companies' decisions to complete the transaction with GTY Holdings.

71.     In their public announcement of the transaction, the GTY Defendants made no mention of OpenGov and failed to acknowledge that GTY Holdings' business combination was the product of OpenGov's intellectual property and hard work. Instead, the GTY Defendants re-wrote history and credited themselves for the acquisition strategy they had brazenly

misappropriated from OpenGov.  For example, the GTY Defendants claimed in their press release that, "[a]fter an extensive search process, *the sponsors* [GTY Investors] elected to bring together best-in-class companies to establish an integrated software solution in the highly fragmented and underpenetrated public sector market."  And, in an investor call on the day the transaction was announced, GTY Holdings' Co-Chairman and Co-CEO Joe Tucci claimed that "*we* are creating a new SaaS company for the North American state and local government market which will serve five of the fastest growing segments in the public sector."

72.     With the clock running out on their SPAC, the GTY Defendants blatantly stole OpenGov's confidential and trade secret information to execute GTY Holdings' business combination—as the GTY Defendants' own description of their transaction makes clear.  In their press release, the GTY Defendants described acquiring six companies to roll-up into one new large "SaaS/Cloud" company to create a "software platform for state and local governments." This is, of course, the same platform roll-up acquisition strategy that OpenGov had developed and shared with the GTY Defendants under the Confidentiality Agreement.  The GTY Defendants also misappropriated OpenGov's "clouds framework" for acquiring software companies in different sub-sectors of the public sector software marketplace.  As the GTY Defendants explained in an investor call, they acquired companies in five "segments in the public sector market."  These "segments" and the companies the GTY Defendants acquired in those segments, are the same as those identified in the confidential, proprietary and trade secret materials OpenGov provided to the GTY Defendants.  Indeed, every single company the GTY

Defendants have announced they will acquire was identified by OpenGov, as shown in the following table:

| OpenGov Platform Roll-Up Acquisition Strategy | | | |
|---|---|---|---|
| Company | Industry Sector | OpenGov Target | Acquired by GTY |
| Bonfire | Procurement | ✓ | ✓ |
| CityBase | Permitting / Regulatory | ✓ | ✓ |
| eCivis | Grants Management | ✓ | ✓ |
| Open Counter | Permitting / Regulatory | ✓ | ✓ |
| Questica | Budget | ✓ | ✓ |
| Sherpa | Budget | ✓ | ✓ |

73.    The GTY Defendants also lifted literally and liberally from OpenGov's proprietary platform roll-up acquisition strategy, as the following table comparing OpenGov's confidential strategy memo to the GTY Defendants' public statements shows:

| OpenGov Confidential Strategy Memo | GTY Defendants' Business Combination |
|---|---|
| Create a "dominant cloud-based software platform in the state and local government market, including through a rollup strategy." | "[W]e are creating a new SaaS company for the North American state and local government market…. [A] truly unique cloud platform to address the needs of state and local governments." (GTY Script at 1.) |
| "This is a multi-billion dollar opportunity to capitalize on a once-in-a-generation inflection point." | The state and local government software market "is at an inflection point of accelerated digital transformation," with software expenditures "estimated to range from $30-$40bn annually." (GTY Script at 1-2.) |
| "[G]overnments are starting the shift from outdated, on-premise legacy transaction processing systems towards modern, flexible, Software-as-a-Service offerings." | "Public sector software is anchored in legacy systems." (GTY PP at 22.) "This market [is] undergoing an incredible digital transformation, and … is just entering the |

21

1311030

| | SaaS/Cloud migration stage." (GTY Script at 2.) |
|---|---|
| "Government buyers want reliable technology partners that address critical business processes and pain points." | "[W]e have assembled a collection of modern, SaaS products that directly address significant 'Pain Points' of state and local governments." (GTY Script at 1.) |
| "This creates a tremendous opportunity to build a SaaS model predicated on very high renewal rates coupled with high rates of upsell and cross-sell." | "We have upgraded several of our products … for ease of upsell…. The cross-selling synergy potential was a significant component of our business thesis." (GTY Script at 9-10.) |
| "The historic dynamics of the government software market have led to highly fragmented, regional offerings…. This pattern has been broken through acquisitive roll-up strategies." | "Given the fragmentation in the state and local government market, we see expansive scale achievable through … accretive acquisitions." (GTY Press Release at 2.) |
| "Our offering is packaged in three distinct 'clouds' … [a]dditional 'clouds' will also be added." | Our company "will serve five of the fastest growing segments in the public sector market." (GTY Script at 1.) |
| These clouds include "Budgeting," "Permitting/Regulatory," "Procurement," "Civic Management," "ERP + Performance," "Transparency," and "Parks" | These five segments are: "payments, budgeting, grants management, permitting, procurement." (GTY Script at 3.) |

74.     According to the GTY Defendants, the transaction is expected to close in "early 2019," with GTY Holdings forming new entities, New GTY and GTY Merger Sub, to effectuate the transaction. Defendant Rohleder will be named the Chairman and Chief Executive Officer of New GTY, and Defendant You will become New GTY's Chief Financial Officer.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against GTY Holdings)

75.     OpenGov incorporates the allegations of paragraphs 1 through 74 as if fully set forth herein.

76.     OpenGov and GTY Holdings entered into a Confidentiality Agreement on May 9, 2017, under which GTY Holdings, the "Recipient" of information, agreed to retain in strict confidence all confidential information provided by OpenGov, including the identities of any other parties identified as acquisition candidates for a potential transaction with OpenGov and all other information provided by OpenGov in connection therewith, and to use such confidential information only in connection with a potential transaction with OpenGov.

22

77.     Pursuant to the Agreement, and relying upon its protections, OpenGov performed its obligations under the Confidentiality Agreement by providing to the GTY Defendants OpenGov's proprietary and confidential information about its business, the cloud-based public sector software market, its platform roll-up acquisition strategy, and the identity of and introductions to other acquisition candidates who would be parties to a potential business combination transaction financed by GTY Holdings with OpenGov at its core, and OpenGov worked with those companies and with GTY Holdings to effectuate a potential transaction involving OpenGov and GTY Holdings.

78.     GTY Holdings breached the Confidentiality Agreement by misusing the confidential information it obtained from OpenGov.  As the GTY Defendants were only permitted to use OpenGov's confidential information in connection with a potential transaction with OpenGov, GTY Holdings' use for its own purposes of OpenGov's proprietary and confidential market analyses, business strategies, company and product details, and the identities of the other, acquisition candidate companies who were to be parties to the transaction with OpenGov, constitutes a breach of the Confidentiality Agreement.

79.     GTY Holdings' breach has damaged OpenGov in an amount to be determined, but in excess of this Court's jurisdictional amount.  OpenGov also is entitled to damages for the actual loss caused to OpenGov by GTY Holdings' breach of the Confidentiality Agreement, and/or for any unjust enrichment GTY Holdings has enjoyed, or may in the future enjoy, that has not been taken into account in computing damages for OpenGov's actual loss.

80.     OpenGov has no adequate remedy at law for the present and threatened future injuries being caused by GTY Holdings' breach of the Confidentiality Agreement.  GTY Holdings' breach of the Confidentiality Agreement and wrongful acquisition of OpenGov's confidential and proprietary information, as described herein, threatens to allow the GTY Defendants unlawfully to establish a competing company using intellectual property the GTY Defendants have not developed, and to interfere with OpenGov's relationships with its customers.  OpenGov's injuries cannot adequately be compensated by money damages.  Indeed, GTY Holdings specifically "acknowledge[d] and agree[d] that money damages may not be a

1  sufficient remedy for any breach of [the] Agreement and that, as a remedy for any such brief,

2  [OpenGov] may be entitled to specific performance, injunctive, and/or other equitable relief."

3  OpenGov, therefore, is entitled to preliminary and permanent injunctive relief.

### SECOND CAUSE OF ACTION
### INDUCING BREACH OF CONTRACT
### (Against New GTY, GTY Merger Sub, GTY Investors, You and Rohleder)

6      81.    OpenGov incorporates the allegations of paragraphs 1 through 80 as if fully set

7  forth herein.

8      82.    As stated above, OpenGov and GTY Holdings are parties to a Confidentiality

9  Agreement with valid and enforceable terms.

10     83.    New GTY, GTY Merger Sub, GTY Investors, You and Rohleder knew of the

11  Confidentiality Agreement between OpenGov and GTY Holdings.  In fact, Defendant You

12  executed that agreement on behalf of GTY Holdings, is a member and manager of GTY

13  Investors, which is the sponsor of GTY Holdings, and is the President and Chief Financial

14  Officer of New GTY and GTY Merger Sub.  Rohleder is a director of GTY Holdings, and will

15  be the Chairman and Chief Executive Officer of New GTY.

16     84.    New GTY, GTY Merger Sub, GTY Investors, You and Rohleder have

17  intentionally caused, and knowingly continue to cause, GTY Holdings to breach the

18  Confidentiality Agreement with OpenGov by misusing OpenGov's confidential, proprietary, and

19  trade secret information in violation of that Agreement.

20     85.    The intentional and detrimental misconduct of New GTY, GTY Merger Sub, GTY

21  Investors, You and Rohleder has been a substantial factor in causing—and continues to be a

22  substantial cause of—damage and severe and irreparable harm to OpenGov.  Such wrongdoing

23  gives rise to this separate cause of action for inducing breach of contract, for which OpenGov

24  seeks both damages in an amount to be determined at trial, and preliminary and permanent

25  injunctive relief.

26     86.    New GTY's, GTY Merger Sub's, GTY Investors', You's and Rohleder's

27  purposeful disregard of OpenGov's contractual rights under the Confidentiality Agreement was

28

24

1311030

1    and is oppressive and was and is being done willfully, wantonly, and maliciously.  As a result of

2    such conduct, OpenGov is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### FRAUD
### (Against All Defendants)

3

4

5    87.    OpenGov incorporates the allegations of paragraphs 1 through 86 as if fully set

6    forth herein.

7    88.    As previously set forth herein, the GTY Defendants induced OpenGov to disclose

8    its proprietary platform roll-up acquisition strategy and related confidential information to the

9    GTY Defendants based on the GTY Defendants' false representations that any transaction GTY

10   Holdings completed in the public sector software market would include and have OpenGov at its

11   core, and material omission that the GTY Defendants did not intend to complete the transaction

12   with OpenGov.

13   89.    The GTY Defendants made numerous intentional misrepresentations of fact and

14   material omissions, including, among other things, that: (1) the GTY Defendants would use

15   GTY Holdings' SPAC trust funds to acquire OpenGov for $225–$250 million, with remaining

16   funds in the SPAC to be used to finance OpenGov's platform roll-up acquisition strategy; (2)

17   after the parties executed OpenGov's strategy to create a vertically-integrated, cloud-based

18   public sector solutions software business combination, OpenGov's CEO Zachary Bookman

19   would become the CEO of the new combined company; (3) this new combined company would

20   be worth over $1 billion in cash when it was formed; and (4) OpenGov's Board directors would

21   serve on the new combined company's Board of Directors.  In truth and fact, and unbeknownst

22   to OpenGov, the GTY Defendants had decided to misappropriate OpenGov's platform roll-up

23   acquisition strategy and confidential information for themselves.

24   90.    The GTY Defendants knew that these misrepresentations were false at the time

25   they were made, and they knew that they were omitting and concealing from OpenGov material

26   facts that they were obligated to disclose.

27   91.    OpenGov justifiably relied on the GTY Defendants' misrepresentations, and relied

28   upon the absence of omitted facts necessary to make the facts represented not misleading.  As

COMPLAINT
Case No.

1311030

previously set forth herein, in reliance on the GTY Defendants' misrepresentations and omissions, OpenGov, among other things: (1) disclosed the details of its confidential and proprietary roll-up acquisition strategy to the GTY Defendants, including the identities of and rationale for acquiring various acquisition target companies; (2) devoted significant time and resources working in a joint venture with the GTY Defendants to execute OpenGov's roll-up acquisition strategy; (3) used its CEO Zachary Bookman's connections and reputation to begin acquisition discussions with the targets that OpenGov had identified, and then introduced OpenGov's contacts at those companies to the GTY Defendants; (4) provided the GTY Defendants with OpenGov's confidential financial and business information; and (5) worked diligently to prepare OpenGov for the intended business combination, including by engaging an accounting firm to conduct a comprehensive audit, investing in pre-audit work, and retaining outside transactional counsel.

92.    Had OpenGov known of the falsity of the GTY Defendants' representations, and the material facts that the GTY Defendants wrongfully concealed, OpenGov would not have taken the actions described above.

93.    As a direct and proximate result of the GTY Defendants' misconduct, OpenGov has been damaged in an amount to be determined, but in excess of this Court's jurisdictional amount.

94.    OpenGov is also entitled to an award of punitive damages for the GTY Defendants intentionally fraudulent and deceitful conduct.

95.    OpenGov has no adequate remedy at law for the present and threatened future injuries being caused by the GTY Defendants' fraudulent representations and omissions. OpenGov, therefore, is entitled to preliminary and permanent injunctive relief.

### FOURTH CAUSE OF ACTION
**TRADE SECRET MISAPPROPRIATION—Cal. Civil Code §§ 3426, *et seq.*)**
**(Against All Defendants)**

96.    OpenGov incorporates the allegations of paragraphs 1 through 95 as if fully set forth herein.

1311030

97.     OpenGov owns and possesses certain confidential and proprietary information as alleged above, including but not limited to OpenGov's platform roll-up acquisition strategy. This information was a trade secret at the time it was misappropriated by the GTY Defendants.

98.     OpenGov's trade secrets derive independent economic value, actual or potential, from not being generally known to the public, or to other entities and persons such as the GTY Defendants, who can obtain value from their disclosure or use. OpenGov's knowledge and use of its trade secrets provided OpenGov with competitive advantages over those who did not know them. OpenGov's trade secrets were not matters either of general knowledge, nor of special knowledge to persons who were skilled in the cloud-based public sector software technology field.

99.     OpenGov has made, and continues to make, efforts that are reasonable under the circumstances to protect the secrecy of its trade secrets by, among other things, requiring all recipients of OpenGov's trade secret information, including the GTY Defendants, to enter into written confidentiality agreements, by designating certain documents containing trade secret information as "confidential," and by restricting access to trade secret information to employees who need to know them, and to customers, or joint venturers, or licensees only upon their agreement to keep such information confidential.

100.    The GTY Defendants have misappropriated and threaten to further misappropriate OpenGov's trade secrets, as described herein.

101.    The GTY Defendants' misappropriation of OpenGov's trade secrets has damaged OpenGov in an amount to be determined, but in excess of this Court's jurisdictional amount. OpenGov is entitled to damages for the actual loss caused to OpenGov by the GTY Defendants' misappropriation of OpenGov's trade secrets, and/or for any unjust enrichment the GTY Defendants have enjoyed by such misappropriation that has not been taken into account in computing damages for OpenGov's actual loss.

102.    The GTY Defendants' breach has damaged OpenGov in an amount to be determined, but in excess of this Court's jurisdictional amount.

103.    OpenGov has no adequate remedy at law for the present and threatened future injuries being caused by the GTY Defendants.  The GTY Defendants' continuing misappropriation of OpenGov's trade secrets, as described herein, threatens to allow the GTY Defendants unlawfully to establish a competing company using intellectual property the GTY Defendants have not developed, and to interfere with OpenGov's relationships with its customers.  OpenGov's injuries cannot adequately be compensated by money damages.  OpenGov, therefore, is entitled to preliminary and permanent injunctive relief.

104.    The GTY Defendants' misappropriation of OpenGov's trade secrets was willful and malicious.  California Civil Code Sections 3426.3(c) and 3426.4 thus entitle OpenGov to an award of exemplary damages equal to twice the actual damages caused by the GTY Defendants' misappropriation, as well as OpenGov's reasonable attorney's fees.

## PRAYER FOR RELIEF

For all of these reasons, OpenGov prays for the following relief:

1.      A judgment in favor of OpenGov on all causes of action alleged herein;

2.      Monetary damages, in an amount according to proof;

3.      A constructive trust over OpenGov's interest in New GTY and GTY Merger Sub, or over their increased value due to the business combination, or over their profits;

4.      Disgorgement of the GTY Defendants' unjust enrichment in an amount according to proof;

5.      Exemplary and punitive damages;

6.      Attorneys' fees, costs, and expenses incurred by OpenGov;

7.      Preliminary and permanent injunctive relief;

8.      Pre-judgment and post-judgment interest;

9.      All other relief that the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

28

COMPLAINT
Case No.

1311030

## VI.    JURY TRIAL DEMANDED

OpenGov demands a trial by jury of all issues so triable.

Dated:  November 20, 2018                                   KEKER, VAN NEST & PETERS LLP

By:  _____
JOHN W. KEKER
JEFFREY R. CHANIN
NICHOLAS S. GOLDBERG

Attorneys for Plaintiff
OPENGOV, INC.

29

1311030

# EXHIBIT A

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement") dated as of May 9th, 2017(the "Effective Date"), shall govern the conditions under which we ("Recipient" or "we" or "us" or "our") have agreed to discuss a possible transaction (the "Potential Transaction") with OpenGov, Inc. and/or one or more of its affiliates and/or subsidiaries (collectively, the "Company"). Company and Recipient may be referred to herein individually as a "Party" or collectively as the "Parties."

1. As a condition to such discussions, we agree to keep strictly confidential all information conveyed by the Company or the Company's "Representatives" (as defined below) to us or such information conveyed in connection with the Potential Transaction by us or on our behalf to our "Representatives" (as defined below), furnished on or after the Effective Date, and in whatever form, whether written, electronic or oral, hereinafter referred to as the "Confidential Information," and to refrain from using the same except as provided below. Notwithstanding the foregoing, any Confidential Information disclosed orally by the Company or its Representatives must be confirmed in writing as Confidential Information to the Recipient within thirty (30) days from the date of its initial oral disclosure or it shall not be subject to the terms of this Agreement. A Party's "Representatives" shall mean all of the Party's subsidiaries and affiliates and its and their respective officers, directors, employees, members, partners, potential debt financing sources, potential coinvestors, attorneys, accountants, consultants, agents and financial advisors. Recipient's "Representatives" shall be further defined to mean only those of its Representatives to whom the Confidential Information hereafter is provided. For purposes of this Agreement, "Confidential Information" shall also include (i) all analyses, compilations, reports, forecasts, studies, interpretations or other documents prepared by us or our Representatives in connection with our evaluation of the Potential Transaction (including, without limitation, those that contain, reflect or are based upon, in whole or part, the information furnished to us or our Representatives pursuant hereto and only to the extent such documents contain Confidential Information), (ii) the existence of a possible transaction involving the Company or discussions thereof, the identity of any parties involved in such possible transaction, and all other information provided in connection therewith, including without limitation that we are in discussions or negotiations with the Company as to the Potential Transaction and that the Company is considering the Potential Transaction or any other potential investment in the Company by us or any other party, and (iii) that we have, or any other party (including any of our Representatives) has, received or will receive any Confidential Information.

2. This Agreement will confirm our agreement to retain in strict confidence all Confidential Information. The term "Confidential Information" shall not include information that (i) is or becomes available to us or our Representatives on a non-confidential basis from a source other than the Company or the Company's Representatives, provided that such other source is not known by us to be bound by an obligation of confidentiality or nonuse with respect to such information, (ii) is or becomes available to the public from a source other than us or our Representatives, (iii) is independently developed by us or our Representatives without the use of or reference to any Confidential Information or (iv) was within our possession prior to it being furnished to us by or on behalf of the Company or the

Company's Representatives. We and our Representatives will use such Confidential Information only in connection with our consideration of whether to enter into the Potential Transaction with the Company and our evaluation, negotiation and/or consummation of a Potential Transaction with the Company. We hereby agree that all Confidential Information will be maintained securely while in our or our Representatives' possession. We shall have the right to communicate the Confidential Information only to our Representatives who need to know the Confidential Information for the purposes of assisting or advising us with respect to the Potential Transaction, provided that each such Representative shall be instructed by us to abide by the confidentiality and use terms of this Agreement as if any such Representative was party hereto. We and our Representatives agree that, without prior written consent of the Company and except in accordance with the provisions set forth in this Agreement, we and our Representatives will not disclose to any other person any Confidential Information.

3.  Except as set forth in any definitive agreement executed by the parties hereto in connection with a Potential Transaction, we acknowledge that neither the Company nor any of the Company's Representatives makes any representation as to the accuracy or completeness of such Confidential Information and that neither the Company nor any of the Company's Representatives shall have any liability to us or our Representatives as a result of our or our Representatives' reliance on or use of such Confidential Information. We agree that, until a definitive acquisition agreement is executed between us and the Company, the Company has no legal obligation of any kind whatsoever with respect to any transaction (including the Potential Transaction), including any obligation to consummate the Potential Transaction, conduct or continue discussions or negotiations or enter into or negotiate a definitive agreement, by virtue of this Agreement or otherwise. Notwithstanding the preceding sentence, nothing in this Agreement shall prohibit the enforcement of any binding terms of an executed letter of intent or any other definitive written agreement between us and the Company.

4.  Promptly upon request by or on behalf of the Company, we agree to return or destroy, at our sole election, all Confidential Information in our or our Representatives' possession. Notwithstanding the foregoing, we and our Representatives shall (i) be permitted to retain a copy of the Confidential Information to the extent required to comply with applicable law, court order or other legal or regulatory process or authority or written and established internal document retention policies and (ii) not be required to destroy, delete, or modify any backup tapes or other media pursuant to automated archival processes in our ordinary course of business, provided in each case (i) and (ii) herein, any such Confidential Information retained shall remain subject to the confidentiality obligations of this Agreement for the term of this Agreement.

5.  To the extent the disclosure of Confidential Information is requested or required by any law, regulation, court order, subpoena, civil investigative demand, arbitration or legal, regulatory, or judicial process or proceeding by or before a governmental, regulatory or self-regulatory authority or by the rules of any recognized stock exchange, we will provide prompt advance written notice (to the extent practicable or legally permissible) of such request or requirement and the documents and/or information required thereunder to the Company prior to disclosing any Confidential Information and cooperate with any attempt

2

by the Company (at the Company's sole cost and expense) to obtain confidential treatment thereof. If in the absence of a protective order or the receipt of a waiver hereunder we are nonetheless, upon the advice of our counsel, required to disclose Confidential Information, we may disclose without liability hereunder that portion of the Confidential Information which our counsel advises that we are required to disclose; provided, however, that we shall give the Company written notice of the information to be so disclosed as far in advance of its disclosure as is practicable and legally permissible and shall use our commercially reasonable efforts to cooperate with the Company (at the Company's sole cost and expense) in its efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the information required to be disclosed as the Company designates.

6.   The Company has read our prospectus, dated October 26, 2016 (the "Prospectus"), and understands that we have established a segregated trust account (the "Trust Account"), for the benefit of the public shareholders (as defined in the Prospectus). The Company hereby agrees that it does not have any right, title, interest or claim of any kind in or to any monies in the Trust Account, including without limitation any claim for indemnification ("Claim") and hereby waives any Claim it may have in the future as a result of, or arising out of, any negotiations, contracts or agreements amongst us and the Company and will not seek recourse against the Trust Account for any reason whatsoever.

7.   We acknowledge and agree that money damages may not be a sufficient remedy for any breach of this Agreement and that, as a remedy for any such breach, the Company may be entitled to specific performance, injunctive, and/or other equitable relief. Such remedy shall not be deemed to be the exclusive remedy for any breach of this Agreement. In addition to the Company's other rights hereunder, the Company retains all rights and remedies the Company may have under applicable law. This Agreement and all matters arising from or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof. We agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of either party with respect to this agreement. We hereby irrevocably and unconditionally consent to submit to the jurisdiction of the courts of the State of New York and of the United States of America located in the State of New York for any action, suit or proceeding arising out of or relating to this Agreement, agree not to commence any suit, action or proceeding relating thereto except in such courts, and waive, to the fullest extent permitted by law, the right to move to dismiss or transfer any action brought in such court on the basis of any objection to personal jurisdiction or venue.

8.   We agree and acknowledge that this Agreement cannot be amended or terminated, and no provision may be waived or modified, without the written consent of both Recipient and the Company. This Agreement represents the entire understanding and agreement of the parties hereto and may be modified only by a separate written agreement executed by us and the Company expressly modifying this Agreement.

9.   The terms and conditions of this Agreement will continue for a period of two (2) years from the Effective Date.

AmericasActive:8148732.2

10. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law, and such invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the Company's intention with respect to such invalid or unenforceable term or provision.

11. The provisions of this Agreement shall be binding solely upon and inure to the benefit of the parties hereto and their respective successors and assigns. We may not assign any or all rights, powers, privileges and obligations under this Agreement without the Company's prior written consent.

12. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but such counterparts shall together constitute one and the same agreement. Execution and delivery of this Agreement by electronic exchange bearing the copies of a party's signature shall constitute a valid and binding execution and delivery of this Agreement by such party. Such electronic copies shall constitute enforceable original documents.

*[Signature Page Follows]*

AmericasActive:8148732.2

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

RECIPIENT:

GTY TECHNOLOGY HOLDINGS INC.

By: _Harry L. You_

Name: Harry L. You

Title: President & CFO

COMPANY: OPENGOV, INC.

By: _____

Name:

Title:

*[Signature Page to Confidentiality Agreement]*

AmericasActive 81487322

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

JOHN W. KEKER #49092; JEFFREY R. CHANIN #103649; NICHOLAS S. GOLDBERG #273614
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
TELEPHONE NO.: 415-391-5400        FAX NO.: 415-397-7188
ATTORNEY FOR *(Name)*: Plaintiff OPENGOV, INC.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
STREET ADDRESS: 400 County Center, 2nd Floor
MAILING ADDRESS: 400 County Center, 2nd Floor
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern Branch

**ENDORSED FILED**
**SAN MATEO COUNTY**

NOV 2 0 2018

Clerk of the Superior Court
By  MIRNA P. RIVERA-MARTINEZ
DEPUTY CLERK

CASE NAME: OPENGOV, INC. v. GTY TECHNOLOGY HOLDINGS INC., ET AL.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 18CIV06264 |
|---|---|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☒ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

**2.** This case ☒ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. ☐ Large number of separately represented parties      d. ☒ Large number of witnesses
  b. ☒ Extensive motion practice raising difficult or novel   e. ☐ Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve              in other counties, states, or countries, or in a federal court
  c. ☒ Substantial amount of documentary evidence        f. ☒ Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply)*: a. ☒ monetary   b. ☒ nonmonetary; declaratory or injunctive relief   c. ☒ punitive

**4.** Number of causes of action *(specify)*: (1) Breach of Contract; (2) Inducing Breach of Contract; (3) Fraud; (4) Trade Secret Misappropriation

**5.** This case ☐ is . ☒ is not   a class action suit.

**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: November 20, 2018

JOHN W. KEKER
(TYPE OR PRINT NAME)                                         *John W. Keker*
                                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] 1310027 | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 *www.courtinfo.ca.gov* |
|---|---|---|

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

1310987

American LegalNet, Inc.
www.FormsWorkflow.com

CM-010

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36) Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

1310987

American LegalNet, Inc.
www.FormsWorkflow.com

NOTICE OF CASE MANAGEMENT CONFERENCE

*Opengov, Inc.*

**ENDORSED FILED**
**SAN MATEO COUNTY** Case No: 1 8 C I V 0 6 2 6 4

NOV 2 0 2018

*GTV Technology Holdings Inc.* vs. Clerk of the Superior Court   Date: MAR 2 1 2019
BY MIRNA P. RIVERA-MARTINEZ
DEPUTY CLERK

Time 9:00 a.m.

Dept. ___11___   —on Tuesday & Thursday
Dept. _____   —on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1. In accordance with applicable California Rules of the Court and local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:

   a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 201.7).

   b) Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.

   c) File and serve a completed Case Management Statement at least 15-days before the Case Management Conference (CRC 212(g)). Failure to do so may result in monetary sanctions.

   d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than 30-days before the date set for the Case Management Conference.

2. If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.

3. Continuances of Case Management Conferences are highly disfavored unless good cause is shown.

4. Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10-days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.

5. If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes", etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.

6. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

7. The Case Management Judge will issue orders at the conclusion of the conference that may include:

   a) Referring parties to voluntary ADR and setting an ADR completion date;

   b) Dismissing or severing claims or parties;

   c) Setting a trial date.

8. The Case Management Judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at:  www.sanmateocourt.org

*Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).*

**CM-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| | |

TELEPHONE NO.:                    FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):* ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:                Time:            Dept.:         Div.:           Room:

Address of court *(if different from the address above)*:

☐    **Notice of Intent to Appear by Telephone, by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

Page 1 of 5

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courts.ca.gov

American LegalNet, Inc.
www.FormsWorkFlow.com

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.   b.   Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

    ☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
    The party or parties request  ☐ a jury trial  ☐ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
    a. ☐  The trial has been set for *(date):*
    b. ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

    c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
    The party or parties estimate that the trial will take *(check one):*
    a. ☐  days *(specify number):*
    b. ☐  hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
    The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
    a.  Attorney:
    b.  Firm:
    c.  Address:
    d.  Telephone number:              f.  Fax number:
    e.  E-mail address:                g.  Party represented:
    ☐  Additional representation is described in Attachment 8.

9. **Preference**
    ☐  This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
    a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

        (1)  For parties represented by counsel: Counsel ☐  has   ☐  has not   provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

        (2)  For self-represented parties: Party ☐  has   ☐  has not reviewed the ADR information package identified in rule 3.221.

    b.  **Referral to judicial arbitration or civil action mediation** (if available).

        (1) ☐  This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

        (2) ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

        (3) ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

American LegalNet, Inc.
www.FormsWorkFlow.com

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c.  Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)* :<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

**CASE MANAGEMENT STATEMENT**

American LegalNet, Inc.<br>www.FormsWorkFlow.com

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

11. **Insurance**
    a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:
    b. Reservation of rights: ☐ Yes ☐ No
    c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

12. **Jurisdiction**
    Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
    ☐ Bankruptcy ☐ Other *(specify)*:
    Status:

13. **Related cases, consolidation, and coordination**
    a. ☐ There are companion, underlying, or related cases.
    　　(1) Name of case:
    　　(2) Name of court:
    　　(3) Case number:
    　　(4) Status:
    　　☐ Additional cases are described in Attachment 13a.

    b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

14. **Bifurcation**
    ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

15. **Other motions**
    ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

16. **Discovery**
    a. ☐ The party or parties have completed all discovery.
    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

    | Party | Description | Date |
    |---|---|---|

    c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:


American LegalNet, Inc.
www.FormsWorkFlow.com

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.


American LegalNet, Inc.
www.FormsWorkFlow.com

# SUPERIOR COURT
# OF
# CALIFORNIA
# COUNTY OF
# SAN MATEO



# LOCAL COURT
# RULES

## As Amended
## Effective July 1, 2018

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
Hall of Justice and Records
400 County Center, 2nd Floor
Redwood City, California 94063

Superior Court of California, County of San Mateo

## CHAPTER 7.  COMPLEX CASES

Rule 2.30    Determination of Complex Case Designation.

### A.    Decision of Complex Case to be Made by Presiding Judge

The Presiding Judge shall decide whether an action is a complex case within the meaning of California Rules of Court, Rule 3.400,  subdivision (a), and whether it should be assigned to a single judge for all purposes.   All status conferences or other hearings regarding whether an action should be designated as complex and receive a singly assigned judge shall be set in the Presiding Judge's department.

### B.    Provisional Designation.

An action is provisionally a complex case if it involves one or more of the following types of claims: (1) antitrust or trade regulation claims; (2) construction defect claims involving many parties or structures; (3) securities claims or investment losses involving many parties; (4) environmental or toxic tort claims involving many parties; (5) claims involving massive torts; (6) claims involving class actions; or (7) insurance coverage claims arising out of any of the claims listed in subdivisions (1) through (6).

The Court shall treat a provisionally complex action as a complex case until the Presiding Judge has the opportunity to decide whether the action meets the definition in California Rules of Court, Rule 3.400, subdivision (a).

### C.    Application to Designate or Counter-Designate an Action as a Complex Case.

Any party who files either a Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.401) or a counter or joinder Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.402, subdivision (b) or (c)), designating an action as a complex case in Items 1, 2 and/or 5, must also file an accompanying Certificate Re: Complex Case Designation in the form prescribed by the Court.   The certificate must include supporting information showing a reasonable basis for the complex case designation being sought.   Such supporting information may include, without limitation, a brief description of the following factors as they pertain to the particular action:

(1)    Management of a large number of separately represented parties;
(2)    Complexity of anticipated factual and/or legal issues;
(3)    Numerous pretrial motions that will be time-consuming to resolve;
(4)    Management of a large number of witnesses or a substantial amount of documentary evidence;
(5)    Coordination with related actions pending in one or more courts in other counties, states or countries or in a federal court;
(6)    Whether or not certification of a putative class action will in fact be pursued; and
(7)    Substantial post-judgment judicial supervision.

A copy of the Certificate Re: Complex Case Designation must be served on all opposing parties. Any certificate filed by a plaintiff shall be served along with the initial service of copies of the Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.401), summons, and complaint in the action. Any certificate filed by a defendant shall be served together with the service of copies of the counter or joinder Civil Case Cover Sheet (pursuant to California Rules of Court, Rule 3.402, subdivision (b) or (c)) and the initial first appearance pleading(s).

### D.    Noncomplex Counter-Designation.

Superior Court of California, County of San Mateo

If a Civil Case Cover Sheet designating an action as a complex case and the accompanying Certificate Re: Complex Case Designation has been filed and served and the Court has not previously declared the action to be a complex case, a defendant may file and serve no later than its first appearance a counter Civil Case Cover Sheet designating the action as not a complex case. Any defendant who files such a noncomplex counter-designation must also file and serve an accompanying Certificate Re: Complex Case Designation in the form prescribed by this Court and setting forth supporting information showing a reasonable basis for the noncomplex counter-designation being sought.

Once the Court has declared the action to be a complex case, any party seeking the Presiding Judge's decision that the action is not a complex case must file a noticed motion pursuant to Section H below.

E.   **Decision by Presiding Judge on Complex Case Designation; Early Status Conference.**

If a Civil Case Cover Sheet designating an action as a complex case and the accompanying Certificate Re: Complex Case Designation have been filed and served, the Presiding Judge shall decide as soon as reasonably practicable, with or without a hearing, whether the action is a complex case and should be assigned to a single judge for all purposes.

Upon the filing of a Civil Case Cover Sheet designating an action as a complex case and the accompanying Certificate Re: Complex Case Designation, the Clerk of the Court shall set a status conference at which the Presiding Judge shall decide whether or not the action is a complex case. This status conference shall be held no later than (a) 60 days after the filing of a Civil Case Cover Sheet by a plaintiff (pursuant to California Rules of Court, Rule 3.401) or (b) 30 days after the filing of a counter Civil Case Cover Sheet by a defendant (pursuant to California Rules of Court, Rule 3.402, subdivision (a) or (b)), whichever date is earlier.

Alternatively, in his or her sole discretion, the Presiding Judge may make the decision on complex case designation and single assignment, without a status conference, based upon the filed Civil Case Cover Sheet and accompanying Certificate Re: Complex Case Designation alone.

F.   **Notice.**
The party who seeks a complex case designation or a noncomplex counter-designation must give reasonable notice of the status conference to the opposing party or parties in the action even if they have not yet made a first appearance in the action. Such notice of the status conference shall be given in the same manner as is required for ex parte applications pursuant to California Rule of Court, Rule 379.

G.   **Tentative Ruling Procedures. (New)**

Tentative rulings by the Presiding Judge on the determination of whether a case will be deemed complex and receive a single assigned judge shall be posted by 3:00 p.m. one court day prior to the Complex Case Status Conference. Counsel for the parties and/or any self-represented parties shall obtain the tentative ruling by telephoning (650) 261-5019 after 3:00 p.m. or by accessing the court's website at: http://www.sanmateocourt.org/online_services/tentative_rulings.php, under the category "Presiding Judge Law and Motion Calendar Tentative Rulings". Parties seeking to contest the tentative ruling and present oral argument at the Complex Case Status Conference shall notify all other parties and the Court by 4:00 p.m. on the court day before the Complex Case Status Conference of that party's intention to appear. That party shall notify the Court by telephoning (650) 261-5019 by 4:00 p.m. The tentative ruling will automatically become the ruling of the Court if the Court has not directed oral argument by its tentative ruling and notice of intent to appear has not been timely given.

Superior Court of California, County of San Mateo

H.   **Representations to the Court.**

By presenting to the Court a Certificate Re: Complex Case Designation, an attorney or unrepresented party is certifying to the best of that person's knowledge, information, and belief, formed after reasonable inquiry under the circumstances:

(1)   That the complex case designation or noncomplex counter-designation is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)   That the claims, defenses, or other legal contentions referenced therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)   That the statement of supporting information relevant to the complex case designation or noncomplex counter-designation have evidentiary support or are believed, in good faith, likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4)   That there is a reasonable basis for that party's complex case designation or noncomplex counter-designation.

If, after notice and a reasonable opportunity to be heard, the Court determines that this subpart has been violated, the Court may impose an appropriate sanction upon the attorneys, law firms, or self-represented parties that have violated this subpart.

I.   The Presiding Judge's Continuing Power.  (*Repealed, effective July 1, 2015*)

J.   Pilot Program; Sunset Provision. (Repealed, effective 1/1/2007).

(Adopted, effective July 1, 2004)(Amended, effective July 1, 2005) (Amended, effective January 1, 2006)(Amended, effective January 1, 2007) (Amended, effective July 1, 2015)


**RULE NUMBERS 2.31 TO 2.35 ARE RESERVED**

**CHAPTER 8.   ACCESS TO COURT RECORDS**

Rule 2.36   Public Access and Privacy

Please reference. California Rules of Court, Rule 1.20.

(Adopted, effective January 1, 2008)

Rule 2.37   Public Access.

Exhibits or attachments to a document that are filed or lodged with or otherwise presented to the court, that are not otherwise marked as confidential or sealed, may be subject to public viewing and access either at the courthouse or electronically on-line (California Rules of Court, Rule 2.503, et seq.).

(Adopted, effective January 1, 2008)

Rule 2.38   Electronic Access.

Superior Court of California, County of San Mateo

Documents that are part of a court record are reasonably made available to the public electronically under the Court's Electronic Imaging program as permitted by California Rules of Court, Rules 2.500, et seq. Documents that are not properly protected by being marked confidential or sealed by court order may be subject to public access as discussed in Rule 2.38.

(Adopted, effective January 1, 2008)

| Attorney or Party without Attorney (Name/Address)<br>JOHN W. KEKER<br>KEKER, VAN NEST & PETERS LLP<br>633 Battery St., San Francisco, CA 94111<br>Telephone:   415-391-5400<br>State Bar No.:49092<br>Attorney for: Plaintiff OPENGOV, INC. | FOR COURT USE ONLY<br><br>**ENDORSED FILED**<br>SAN MATEO COUNTY<br><br>NOV 2 0 2018<br><br>Clerk of the Superior Court<br>By MIRNA P. RIVERA-MARTINEZ<br>DEPUTY CLERK |
|---|---|
| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN MATEO<br>400 COUNTY CENTER<br>REDWOOD CITY, CA 94063 | |
| Plaintiff<br>OPENGOV, INC. | |
| Defendant<br>GTY TECHNOLOGY HOLDINGS INC., et al. | |
| **Certificate Re Complex Case Designation** | Case Number<br>**18CIV06264** |

# This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

1.  In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

    ☐ Box 1 – Case type that is best described as being [or not being] provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

    ☒ Box 2 – Complex [or not complex] due to factors requiring exceptional judicial management

    ☐ Box 5 – Is [or is not] a class action suit.

2.  This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions

CV-59 [Rev. 1/06]                                                              www.sanmateocourt.org

pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision]:

See attached supplement to Certificate re Complex Designation

_____

_____

_____

_____

_____

*(attach additional pages if necessary)*

3.   Based on the above-stated supporting information, there is a reasonable basis for the complex case designation or counter-designation [or noncomplex case counter-designation] being made in the attached Civil Case Cover Sheet.

\*\*\*\*\*

I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct and that I make this certification subject to the applicable provisions of California Code of Civil Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San Mateo County Superior Court Local Rules, Local Rule 2.30.

Dated:   November 20, 2018

JOHN W. KEKER
[Type or Print Name]

*signature*
[Signature of Party or Attorney For Party]

1  KEKER, VAN NEST & PETERS LLP
   JOHN W. KEKER - # 49092
2  jkeker@keker.com
   JEFFREY R. CHANIN - # 103649
3  jchanin@keker.com
   NICHOLAS S. GOLDBERG - # 273614
4  ngoldberg@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:   415 391 5400
6  Facsimile:   415 397 7188

7
   Attorneys for Plaintiff
8  OPENGOV, INC.

**ENDORSED FILED**
**SAN MATEO COUNTY**

NOV 2 0 2018

Clerk of the Superior Court
By MIRNA P. RIVERA-MARTINEZ
DEPUTY CLERK

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10            IN AND FOR THE COUNTY OF SAN MATEO

11

12  OPENGOV, INC.                    Case No.   **18CIV06264**

13          Plaintiff,              **OPENGOV, INC.'S SUPPLEMENT TO**
                                    **CERTIFICATE RE COMPLEX**
           v.                       **DESIGNATION**
14
    GTY TECHNOLOGY HOLDINGS INC., a
15  Cayman Islands exempted company, GTY
    TECHNOLOGY HOLDINGS INC., a
16  Massachusetts corporation, GTY
    TECHNOLOGY MERGER SUB, INC., a
17  Delaware corporation, GTY INVESTORS,
    LLC, a Delaware limited liability company,
18  HARRY L. YOU, an individual, STEPHEN
    J. ROHLEDER, an individual, and DOES 1
19  through 50, inclusive.

20          Defendants.

21

22

23

24

25

26

27

28

SUPPLEMENT TO CERTIFICATE RE COMPLEX DESIGNATION
Case No.

1311058

## I.       INTRODUCTION

Pursuant to California Rule of Court 3.400 *et seq.*, and Local Civil Rule 2.30, Plaintiff OpenGov, Inc. ("OpenGov") has requested that its case be designated as complex.  As discussed more fully in OpenGov's complaint, OpenGov has sued to obtain redress for Defendants' breach of the parties' Confidentiality Agreement, and Defendants' willful misuse of OpenGov's proprietary, confidential and trade secret information to effectuate a proposed business combination and to compete unlawfully with OpenGov.  The complaint asserts four causes of action: (1) breach of contract, (2) inducing breach of contract, (3) fraud, and (4) trade secret misappropriation.  The day before Plaintiff's filing in this Court, after being told that OpenGov would file a complaint if the matter could not be resolved through settlement, Defendants filed a preemptive lawsuit for declaratory relied in the United States District Court for the Southern District of New York, Case No. 1:18-cv-10854.

Because the underlying venue and merits issues may prove numerous and complex, there will likely be extensive motion practice raising complex issues, the documents are voluminous and there are numerous potential witnesses, including representatives of at least six third party companies who are the subject of Defendants' prospective merger, but whose identities were misappropriated by Defendants from OpenGov, this case will require exceptional judicial management.  It is a compelling candidate for assignment to this Court's Complex Civil Litigation Judge ("Complex Judge"), and both the case and the litigants participating in it will benefit from such an assignment.  Accordingly, OpenGov respectfully requests that the Court designate the case complex and assign it for all purposes to the Complex Judge.

## II.      THE RULE 3.400 FACTORS WARRANT COMPLEX DESIGNATION.

### A.      The case may involve numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve.

This lawsuit is likely to involve pretrial motions raising difficult or novel legal issues that may be time-consuming to resolve.  *See* Cal. R. Ct. 3.400(b)(1).  For example, this case currently involves parallel proceedings in this Court and a Federal Court, and there may be a dispute about venue or whether both cases should proceed.  The complaint further implicates potentially

1    complex legal questions concerning contract, tort, and trade secret law, as well as technical issues

2    regarding Special Purpose Acquisition Companies, Defendants' business structure, and their

3    anticipated business combination.  Some of OpenGov's trade secret information, moreover, is still

4    in the possession of Defendants' agents and has not yet been returned, despite OpenGov's

5    request.  Furthermore, OpenGov's pre-litigation effort to resolve this case was unsuccessful.

6    Based on that experience, it appears that this case will be hard fought, with both sides likely to

7    file preliminary and dispositive motions.  Finally, given the highly specific facts at the heart of

8    this dispute, any motion practice will be time-consuming to resolve.

9         It would be extremely inefficient for these motions to be heard by different judges, all of

10   whom would have to familiarize themselves with the underlying Confidentiality Agreement,

11   multiple parties, and the relevant communications between OpenGov, Defendants, and the six

12   acquisition target companies.  A single assignment to the Court's Complex Judge will better

13   ensure that this dispute can be resolved efficiently so as not to prolong this litigation.

14        **B.      The case will require a substantial amount of documentary evidence, and
               other discovery from a large number of witnesses.**

15

16        This case should also be designated complex because it is expected to involve the

17   management of a substantial amount of documentary evidence and a large number of witnesses,

18   as well as the coordination of discovery issues related to confidential and competitively sensitive

19   documents and information.  *See* Cal. R. Ct. 3.400(b)(2).  The parties were involved prolonged

20   and extensive discussions and communications for well over one year, and during that time they

21   exchanged thousands of pages of documents, text messages, voicemails, and other

22   communications.  OpenGov further expects that there will be a substantial amount of relevant

23   internal communications among Defendants and communications between Defendants and third

24   parties, including the six acquisition targets that OpenGov identified and Defendants

25   subsequently misappropriated.  Many of these documents may involve confidential material,

26   further increasing the complexity involved in the discovery process.

27        Furthermore, this case will require testimony from a substantial number of party and non-

28   party witnesses, including Defendants, Defendants' representatives, bankers and lawyers, and

1   representatives of the six acquisition targets.  Because some of these witnesses are located outside

2   of this Court's jurisdiction, securing these witnesses' testimony may require motion practice and

3   judicial supervision.  It would best serve the principles of justice and judicial efficiency if a single

4   decision-maker manages issues regarding the substantial number of documents and witnesses as

5   the case progresses.

6   **C.    The case potentially involves management of several additional represented
           parties.**

7

8        This case will likely involve multiple represented parties and non-parties.  *See* Cal. R. Ct.

9   3.400(b)(3).  OpenGov's complaint names six Defendants.  The complaint also implicates several

10  non-parties who are likely to be separately represented, including the six acquisition target

11  companies.  Management of these parties and non-parties—several of whom are likely to be

12  separately represented—is best delegated to the Complex Judge.

13  **D.    The action may involve substantial postjudgment judicial supervision.**

14       Finally, because OpenGov seeks injunctive relief, a constructive trust over OpenGov's

15  interest in New GTY and GTY Merger Sub, and disgorgement of Defendants' unjust enrichment,

16  post-judgment judicial supervision may be necessary to ensure compliance with the Court's

17  orders.  *See* Cal. R. Ct. 3.400(b)(5).

18  **III.   CONCLUSION**

19       For these reasons, OpenGov respectfully requests that the Court formally designate this

20  case as "complex," and assign the action to the Court's Complex Judge.

21

    Dated: November 20, 2018                        KEKER, VAN NEST & PETERS LLP

22

23                                          By:      _John W. Keker_

24                                                  JOHN W. KEKER
                                                    JEFFREY R. CHANIN
25                                                  NICHOLAS S. GOLDBERG

26                                                  Attorneys for Plaintiff
27                                                  OPENGOV, INC.

28

                                            3
                       SUPPLEMENT TO CERTIFICATE RE COMPLEX DESIGNATION
                                         Case No.

    1311058

**APPROPRIATE DISPUTE RESOLUTION INFORMATION SHEET**

**SUPERIOR COURT OF CALIFORNIA, SAN MATEO COUNTY**

In addition to the court provided voluntary and mandatory settlement conferences, this court has established, in partnership with the community and Bar Association, the Multi-Option ADR Project. Recognizing that many civil disputes can be resolved without the time and expense of traditional civil litigation, the San Mateo County Superior Court encourages the parties in civil cases to explore and pursue the use of Appropriate Dispute Resolution

**WHAT IS APPROPRIATE DISPUTE RESOLUTION?**

Appropriate Dispute Resolution (ADR) is the general term applied to a wide variety of dispute resolution processes which are alternatives to lawsuits.   Types of ADR processes include arbitration, mediation, neutral evaluation, mini-trials, settlement conferences, private judging, negotiation, and hybrids of these processes.   All ADR processes offer a partial or complete alternative to traditional court litigation for resolving disputes.

**WHAT ARE THE ADVANTAGES OF USING ADR?**

ADR can have a number of advantages over traditional court litigation.

- **ADR can save time**.  Even in a complex case, a dispute can be resolved through ADR in a matter of months or weeks, while a lawsuit can take years.

- **ADR can save money.**  By producing earlier settlements, ADR can save parties and courts money that might otherwise be spent on litigation costs (attorney's fees and court expenses).

- **ADR provides more participation.**  Parties have more opportunity with ADR to express their own interests and concerns, while litigation focuses exclusively on the parties' legal rights and responsibilities.

- **ADR provides more control and flexibility.**  Parties can choose the ADR process most appropriate for their particular situation and that will best serve their particular needs.

- **ADR can reduce stress and provide greater satisfaction.**  ADR encourages cooperation and communication, while discouraging the adversarial atmosphere found in litigation.  Surveys of disputants who have gone through ADR have found that satisfaction with ADR is generally high, especially among those with extensive ADR experience.

**Arbitration, Mediation, and Neutral Evaluation**

Although there are many different types of ADR processes, the forms most commonly used to resolve disputes in California State courts are Arbitration, Mediation and Neutral Evaluation.   The Multi-Option ADR Project a partnership of the Court, Bar and Community offers pre-screened panelists with specialized experience and training in each of these areas.

<u>Arbitration:</u> An arbitrator hears evidence presented by the parties, makes legal rulings, determines facts and makes an arbitration award.  Arbitration awards may be entered as

Form ADR-CV-8 "Court ADR Information Sheet ADR-CV-8" [Rev. Feb. 2014]

judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with California statutes.   Arbitrations can be binding or non-binding, as agreed by the parties in writing.

**Mediation:** Mediation is a voluntary, informal, confidential process in which the mediator, a neutral third party, facilitates settlement negotiations.   The mediator improves communication by and among the parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution of the dispute.

**Neutral Evaluation:** Involves presentations to a neutral third party with subject matter expertise who may render an opinion about the case the strengths and weaknesses of the positions, the potential verdict regarding liability, and a possible range for damages.

## CIVIL ADR PROCEDURES FOR THE SAN MATEO COUNTY SUPERIOR COURT

- Upon filing a Complaint, the Plaintiff will receive this **information sheet** from the Superior Court Clerk.  Plaintiff is expected to include this information sheet when he or she **serves the Complaint** on the Defendant.

- All parties to the dispute may voluntarily agree to take the matter to an ADR process. A stipulation is provided here.  Parties chose and contact their own ADR provider. A Panelist List is available online.

- If the parties have not agreed to use an ADR process, an initial Case Management Conference ("CMC") will be scheduled within 120 days of the filing of the Complaint.  An **original and copy of the Case Management Conference Statement must be completed and provided to the court clerk no later than 15 days prior to the scheduled conference**. The San Mateo County Superior Court Case Management Judges will strongly encourage all parties and their counsel to consider and utilize ADR procedures and/or to meet with the ADR director and staff where appropriate.

- If the parties voluntarily agree to ADR, the parties will be required to sign and file a **Stipulation and Order to ADR.**

- A timely filing of a stipulation (at least 10 days prior to the CMC) will cause a notice to vacate the CMC.  ADR stipulated cases (other than judicial arbitration) will be continued for further ADR/Case Management status review in 90 days.  If the case is resolved through ADR, the status review date may be vacated if the court receives a dismissal or judgment. The court may upon review of case information suggest to parties an ADR referral to discuss matters related to case management, discovery and ADR.

- Any ADR Services shall be paid for by the parties pursuant to a separate ADR fee agreement. The ADR Director may screen appropriate cases for financial aid where a party is indigent.

- Local Court Rules require your cooperation in evaluating the ADR Project and will expect a brief evaluation form to be completed and submitted **within 10 days of completion of the process.**

**You can find ADR forms on the ADR webpage: www.sanmateocourt.org/adr. For more information contact the Multi-Option ADR Project at (650) 261-5075 or 261-5076.**